UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL GALESKI,

        Plaintiff(s),

v.

CITY OF DEARBORN,

        Defendant(s).

_____/

Case No. 09-11150

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [11]**

This employment dispute comes before the Court on Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff Daniel Galeski's Complaint alleges claims of sex discrimination and retaliation against Defendant City of Dearborn under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2201, *et seq.* For the reasons set forth below, Defendant's motion is GRANTED.

**I.  Facts**

Plaintiff was employed by Defendant's Department of Recreation as a part-time recreation associate and sound engineer at Defendant's Ford Community and Performing Arts Center (Theater) from September 11, 2001 until his termination on April 18, 2008. (Compl. ¶ 11; Def.'s Mot., Exs. A-B, X.) At the time of hire, Plaintiff executed an At-Will Acknowledgment Form and an Acknowledgment of Receipt of Part-Time/Seasonal/Temporary Employees Handbook form. (Def.'s Mot., Exs. B-C.)

On February 20, 2004, an anonymous complaint was sent to the Mayor of the City of Dearborn alleging that Plaintiff was living in the Theater and using the laundry equipment located in that facility. (Def.'s Mot., Ex. D; Galeski Dep., Def.'s Mot., Ex. G at 24-25.) Defendant denied having lived in the Theater, but admitted to laundering his work clothes there—as was common for the employees to do. Then-Theater manager Jack Raeburn assured the Mayor's office that the anonymous complaint was without merit. (Def.'s Mot., Ex. E.) Additionally, in a follow-up email, Raeburn informed the Mayor's office that because Plaintiff used his own equipment to record rehearsals and performances during work-hours at the Theater, Raeburn had been including Plaintiff's commuting time in calculating Plaintiff's hourly wages. (Def.'s Mot., Ex. F.) In response to the anonymous complaint and its corresponding investigation, Defendant's Counsel sent the Director of the Department of Recreation a memo recommending two policy changes. First, as the Theater had its own recording equipment, it was unnecessary for employees to bring in their own equipment, thus, commuting time would no longer be included in Theater employees' hourly wages. Second, employees were directed not to do their personal laundry at the Theater, as the laundry facilities were intended to be available only for the laundering of costumes worn in Theater productions. (Def.'s Mot., Ex. F.)

In July of 2005, Jeannie Zimbalatti of the Zimbalatti Dance School, a regular client of the Theater, was organizing a children's dance competition to be held at the Theater and needed someone to videotape the event and distribute recordings to the parents of the participants. Plaintiff offered his services as a videographer-liaison to Zimbalatti on an independent contractor-basis. Plaintiff coordinated a camera crew, utilized equipment owned by Defendant, recorded the competition, and was paid by Zimbalatti for his services.

2

(Galeski Dep. at 21-24; Def.'s Mot., Ex. J.) Issues related to the taping of this event arose and Zimbalatti complained to Defendant about not receiving the promised recordings. (Def.'s Mot., Ex. I.) Although, section 3.6 of the City of Dearborn Charter expressly prohibits employees from using City property for their own personal benefit, (Def.'s Mot., Ex. H), Raeburn did "not restrict[] employees from working for outside clients," but—in an effort to "eliminate confusion over city/contractor roles"—he recommended that they "not simultaneously work as both a contractor and an employee," (Def.'s Mot., Ex. J). It is unclear from the record whether Plaintiff was issued a reprimand in connection with this event.

On May 23, 2006, Plaintiff did not show up for work and thus failed to set-up equipment and conduct a sound check for a Theater client. Plaintiff did, however, explain that he had transportation issues and no home or cell phone to notify Defendant of his absence. Plaintiff was given a Notice of Reprimand informing him of this violation. The Notice also states that he was orally warned for a similar instance of misconduct on September 22, 2002. (Def.'s Mot. Ex. K.)

On August 16, 2006, Martin Zbosnik was hired to replace Raeburn as manager of the Theater. It is subsequent to this date that Plaintiff claims the sexual harassment began. (Galeski Dep. at 26.)

On November 15, 2006, Zbosnik's "odd behavior" began. According to Plaintiff, "[i]t wasn't directly sexual harassment, but it was very odd and inappropriate behavior." (*Id.* at 27-28.) On that date, Plaintiff and his girlfriend Simone Calvas—who was also an employee of Defendant—"walked into the shop and [Zbosnik] was sitting there on one of the desks ... he was looking up, and then he would slowly look down at himself, and up, and then

3

down at himself ... You could see his testicles and his penis, not through the pants ... [y]ou

could see the outline of it. I got past him and went down the hallway." (*Id.* at 29-30.) Other

than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 31.)

Between November 15, 2006 and December 10, 2006, Zbosnik began making

"frequent visits to [Plaintiff] in the booth just to chat." On one occasion, Plaintiff explains,

Zbosnik

> came in and I was telling him that Simone wanted some animation. We
> needed something that had some robots in it. ...
>
> The next day ... he delivers me two DVDs of some fantastic animation. ... I
> thought it was great, ... it matched the music that I was writing and all this
> stuff.
>
> This one part that was animated, the robots were naked. They didn't show
> any detail, but they were naked. I'm not saying there's anything wrong with
> that.
>
> I said, "Maybe it's inappropriate for the kids." We all decided that it's okay.
> We'll use it. ...
>
> I said, "This is great stuff. Where did you get this?"
>
> He said, "I've got a large collection. I used to sell and rent movies."
>
> I said, "Really? What kind of movies? Animation?"
>
> He said, "All kinds of movies. Everything you can think of. We had a little
> place in the back where we sold pornography, all kinds of pornography."
>
> I said, "How many kinds are there?" He said, "A lot. We had male
> masturbation, gay pornography, autoerotic, sex toys and sadomasochistic."
>
> Anyway, I didn't know what these meant. I didn't know what autoerotic was.
> I felt pretty uneasy about this. I thought, you know, here's ... my superior
> talking about this and we've got kids running all around.

(*Id.* at 32-33.) In response to the deposition question, "how is a robot naked?," Plaintiff

responded, "It was like you could see the woman's breast and you could see the outline of

4

the man, but you couldn't see a penis. It was like a robot would have a penis, but it didn't

have one. They didn't wear clothes. ... I guess you could say the robots weren't naked." (*Id*.

at 34.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id*. at 33-34.)

The next incident, occurred a day or so following the robot incident. As Plaintiff

explained in his deposition, Zbosnik

> came up and talked to me again. He talked about ... living in Atlanta. ...
>
> He said he was living in an apartment ... a seedy, run-down place.
>
> One time he was taking a shower and he ... came out and he had a towel around him and there was a guy in his apartment that broke in. ... "There I am standing with an erection. I'm naked and this guy has a gun to me."
>
> I said, "You could maintain an erection with a gun pointed towards you?"
>
> He said, "Yes. I think that kind of turned me on. I think it excited me."

(*Id*. at 34-35.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id*. at

35.)

In mid-December 2006, Plaintiff "was looking for a camera guy" to videotape a

rehearsal, and Zbosnik volunteered. (*Id*. at 35.) Plaintiff stated that "I felt that it was great,

that [Zbosnik] wanted to help us out and [that] it was just beneficial that our supervisor is

helping us. I just went with it." (*Id*. at 36.) In response to Plaintiff's concern that Zbosnik's

camera was inadequate for this particular application, Plaintiff recalls Zbosnik saying, "You

wouldn't believe the things I've done and seen on this camera." (*Id*. at 36.) Plaintiff,

attempting to "connect the dots ... got the impression ... that [Zbosnik] was possibly

involved with some video of pornography, perhaps. It wasn't said, but that's what I was

thinking." (*Id*. at 36-37.) Other than Calvas, Plaintiff did not discuss this incident with

anyone. (*Id*. at 37.)

5

Also in mid-December 2006, Plaintiff claims that Zbosnik began offering to give him rides home from work. (*Id.* at 38 ("[H]e kindly said, 'Hey, if you need a ride home, I can give you a ride home.'") (*Id.* at 41 ("There was [sic] several times where [Zbosnik] would just be flattering and then he would say, 'Hey, can I take you home? Can I give you a ride?'") According to Plaintiff, a fellow co-worker, Aaron Gambino, witnessed some of Zbosnik's requests. At that time, Plaintiff's primary mode of transportation was a bicycle—with a 45 minute commute to work. Plaintiff, however, never accepted any of Zbosnik's offers for a ride home. These offers continued throughout the summer of 2007 when, according to Plaintiff, Zbosnik began to be "more pushy." (*Id.* at 54.) Other than Calvas, Plaintiff did not discuss these conversations with anyone. (*Id.* at 37.)

Around that same time, Plaintiff claims there were "flirtations going on:" that Zbosnik would look him "up and down" and once said, "You would look good on camera." (*Id.* at 40.) According to Plaintiff, Gambino and Calvas witnessed Zbosnik's behavior. Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 37.)

In January 2007, while Plaintiff was working on a DVD for a Christmas show, he was visited by Zbosnik. In his deposition, Plaintiff explains

> [Zbosnik] came to see me while I was working on the DVD. ... We were talking about lighting. ...
>
> He talked about the show that he was involved in that he did the lighting for, which was a laser show, and he was very interested in showing me this video, DVD, of this show that he recorded.
>
> I popped it in my computer to view it. The show ... was about ... a dance-type deal and it had a lot of transvestite men dressed up as woman or transsexuals, as well.

6

> I don't think at that time he was interested in me seeing the lighting show at all. He was just staring at me when I was watching the video to see what my reaction was.

(*Id.* at 66.) Plaintiff did not, however, request Zbosnik to stop playing the DVD, and other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.*)

In late-January or early-February 2007, while working with Calvas, Plaintiff recalls Zbosnik approaching them "just out of the blue." (*Id.* at 42.) According to Plaintiff's deposition:

> [Zbosnik] says to us ... "Yeah I took this black guy home. He was from the show that they had in the comp room. He was a musician. He lived in Detroit. I didn't know where I was. I was scared. It was around some market and it was a weird street, I don't know, it started with a G."
>
> He was being really silly and strange. ...
>
> He said, "It was a group of buildings on a block. He lived in the first building and you go around to the alley. There was a red brick alley and there was a storefront, then there was a candle shop. Apparently he lived in that building. And I dropped him off in front of a green door."
>
> I said, "Is the street Gratiot?"
>
> He said, "Gratiot, that's it."
>
> [Calvas] ... said, "he just explained where you live in detail."
>
> That's exactly where I lived. Of course, he didn't blatantly say it, but I took that as a very strange and creepy way of him wanting me to know he knows where I live.
>
> Now, obviously, he could go to records and find out where I live. I think that's what he did. He probably drove around my neighborhood. Maybe he was curious, I don't know. It was very odd.

(*Id.* at 42-43.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 43.)

In March 2007, as Plaintiff and Zbosnik were coming down the Theater hallway in opposite directions, Zbosnik

> steps in front of me ... and he says, "You have beautiful eyes." ...
>
> Then he realizes that he says that and he takes off. As he's passing me I say, "Thank you." ...
>
> I'm a little bit creeped out. ... [I]t was strange. It was uncomfortable.

(*Id.* at 44-45.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 45.)

Also in March 2007, Plaintiff recalls that

> I had just washed my hair. I had really long hair at the time and ... it's kind of puffy. ...
>
> [H]e says, "Your hair is gorgeous today."
>
> And I said, "Why thank you." And I walked away.

(*Id.* at 45-46.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 46.)

A month later, in April 2007, Plaintiff claims that Zbosnik began offering him "something from the box office or from a little restaurant or café. ... [Zbosnik] would always say ..., 'Here, this is for being a good little boy.' Or he would say, 'Here, this is for being a good worker.'" (*Id.* at 46-47.) Other than Calvas, Plaintiff did not discuss these incidents with anyone. (*Id.* at 47-48.)

In May 2007, Plaintiff claims that Zbosnik's attitude towards him changed. Calvas was pregnant with twins. On one occasion, Plaintiff recalls

> [Zbosnik] says to me ..., "How are you going to support all her kids, your kids, and the new babies that are coming along with you making ... less."

8

That's not the exact words. ... I was kind of shocked. I didn't know what he really meant by that.

I said, "Well, I'm just going to have to ... take on as many hours as I can and hope the sales of the DVDs supply some relief."

He said, "You think so? Do you think I'm going to let you sell DVDs this year?" ...

Then he looked at me and said, "Baby daddy, baby daddy, wah, wah, wah" and walked away. ...

I can't be specific, but ... there was just a lot of condescending remarks and always with the "baby daddy, baby daddy," under his breath or joking. That was an ongoing thing for a long time. Very sarcastic. Very evil at times.

(*Id.* at 48-50.)

Sometime between May 2009 and July 2009, Zbosnik

spontaneously started a story and he said, "Yeah, those girls, you know, those young girls, man, they are something else."

And I go, "What are you talking about?"

He goes, "You know, girls, young girls, they are so easily impressed, you know. You take them home, they see your TV, they see your artwork, your furniture, they are going, 'Wow, you go so much nice stuff.'"

He was trying to imitate a young girl. I just looked down. I look up a him. I look over at him and I said, "What girls do you get that would come over to your apartment, or your place?"

He said, "You know, girls that work here or frequent the fitness area."

I said, "If you can get young girls, more power to you," and I walked away. I was kind of sarcastic with him. ...

It was just odd behavior. It was kind of creepy. I didn't know what he was up to.

(*Id.* at 50-51.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 51.)

9

In the summer of 2007, Plaintiff claims that Zbosnik began spying on him and "would frequently find" him wherever he "was to have small conversations." (*Id.* at 53.) On one occasion, while Plaintiff and a friend were walking through the Theater, Plaintiff recalls his friend commenting, "That guy, [Zbosnik], that you introduced me to, he's looking at us behind that door." (*Id.* at 52.) In response, Plaintiff told his friend, "Yes, he always does that. No big deal." (*Id.* at 53.) Plaintiff did not discuss, or otherwise complain about, this incident with anyone. (*Id.* at 53.)

Also, during the summer of 2007, Plaintiff claims to have noticed Zbosnik driving down his and Calvas' street, as they lived on the same block. On one occasion, when Plaintiff was at Calvas' home, Zbosnik rode up her driveway on his bicycle. According to Plaintiff, Zbosnik was "all decked out. ... He had on the tight lycra shirt, helmet, ... [and] tight lycra pants. ... Everybody was kind of polite." (*Id.* at 54.) According to Plaintiff, Zbosnik declined Calvas' offer to come inside the house and remained seated on his bicycle in the driveway. While Plaintiff was in the rear year gardening, Zbosnik

> was taking his bike and he was riding it ... he had tight clothing on and you could see the outline of his testicles and penis. ... I didn't want to stare, but I could have sworn there was an erection. He was sliding his bike back and forth. ...
>
> He was very quiet that day, didn't say much, just like eyeing me up and down.[1] I could feel it. ...

(*Id.* at 57.) Plaintiff did not report this incident to anyone. (*Id.* at 58.)

---

[1] As Plaintiff explained, Zbosnik "would never really look[] at me in the eye ... He would always look down when he talks to you. I mean it felt like he was looking at my midsection all the time. When he was talking, he would never look up. ... Other people have told me the same thing. ... [T]hey didn't say [that] he was checking me out. ... Other people have said 'He looks down. He doesn't look at you in your face.'" (*Id.* at 55-56.)

10

In July 2007, while working in the Theater, Plaintiff recalls an incident where Zbosnik gave him a candy bar.

> I was at the mixing board and [Zbosnik] approaches me with a ... candy bar and he says, "Here."
>
> I'm like, you know, "I don't really want that."
>
> He said, "I'll put it down. I'll just put it here."
>
> I said, "All right." ...
>
> I took the candy bar ... [and] threw it in this basket backstage. ...
>
> I can't make up my mind. I take it out and I go all the way back in the back room where the shop is. There's a big dumpster, big garbage plastic thing, and I throw it in there and I walk away.
>
> I'm just thinking ... he's been freaking me out lately. I'm afraid if he sees me throw this away, he's just going to be pissed off, or do something, or whatever.
>
> So I run back to the basket and I put it underneath a bunch of stuff, garbage, papers, and I go home for the day.
>
> Sure enough, I come back the next day ... and that thing is on the mixing board. The same candy is on the mixing board. It's freaking me out. I don't know if it's him.

(*Id.* at 58-59.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 60.)

In August 2007, Zbosnik—on his bicycle—followed Plaintiff—on his bicycle—to work.

> I'm on my bike and I see Martin. ...
>
> I'm thinking is he going to follow me? I turn around and sure enough he's riding down Michigan Avenue. I'm thinking I'm just going to leave him in the dirt ... because I'm in pretty good shape. I'm just going to give the old man a run for his money. I just start bolting, and I'm riding hard.

11

> I get all the way to the overpass ... and out of the corner of my eye I see him right by me in the street. I look over and I couldn't believe it. He was keeping up with me. ...
>
> We rode like that for the longest time until I got to the library. I didn't go to work. I wanted to turn off as soon as possible. I turned off into the library and he went straight.

(*Id.* at 60-61.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 62.)

On August 18, 2007, another incident occurred at the Theater, but did not involve Zbosnik. As Plaintiff explained in his deposition:

> I was pretty busy ... and was running around working. ... I came into the office and I wanted to ask Don Bean some questions. All the guys were glued to the computer, Don's computer, and I kind of nudged in there. They were watching pornography on the City computer. I was watching, too, you know, and this isn't the first time it happened. ...
>
> It was a very inappropriate time because there were children unattended running around with the door open.
>
> I watching and I'm waiting for Don's attention to ask him something. ...
>
> It didn't have anything to do with lovemaking. It was pretty graphic. ...
>
> Then I remember—I don't know who, but someone wanted a copy of that and Don said, "I'll give you a copy of it later." ...
>
> I thought that I should say that. What does it have to do with Martin? Well, I never really witnessed anything like that ever going on when Jack Rayburn [sic] was manager. It seems to me that all morality has gone down at the Performing Arts Center since [Zbosnik] has been general manager.

(*Id.* at 69-71.)

Then, in September of 2007, Plaintiff claims that Zbosnik began "to be very hateful and aggressive towards me." (*Id.* at 72.) It was the "same old thing, just kind of like condescending telling me that, you know, what a loser, what kind of father will I be to those

twins, I can't afford to have my own kids, loser, more of the baby daddy, baby daddy, but at the same time always bringing me more gifts of cakes, candy and Cokes to be left on the equipment at times for me or handed to me." (*Id.*)

In October 2007, while "sitting in Don Bean's office looking at a Metro Times" magazine, Plaintiff turned to the page where "there's transgenders advertising their prostitution services" when Zbosnik "happens to come into the office." (*Id.* at 72-73.)

> He's over my shoulder and he said, "Oh, you like those? I manage a crew of them. I can get you one of those." ...
>
> I was very disgusted at that point and I got up and walked out. ...
>
> He was trying to get a rise out of me. This time I'm not giving him any satisfaction.

(*Id.* at 73.) Plaintiff did not complain about this incident to anyone. (*Id.*)

On November 26, 2007, Plaintiff arrived at work without his uniform on. Zbosnik met Plaintiff "at the door and he said, 'You're out of uniform ... [n]ice legs, but you're out of uniform.'" (*Id.* at 74.) According to Plaintiff, he told Zbosnik to "[j]ust stop" and Zbosnik, in turn, attempted to grab him and said, "What's wrong with you?" (*Id.*) Plaintiff was reprimanded and a Staff Discipline Report was issued for violating the employee dress code. The report notes that Plaintiff had been previously warned for a similar violation, but does not indicate the date of the prior violation. (Def.'s Mot., Ex. L.) Plaintiff refused to sign the Report. This was the second written reprimand that Plaintiff received.

On November 28, 2007, Jon Smith, Technical Supervisor for the Theater, sent Plaintiff an email asking if he would rather work inside the Theater or outside during a winter holiday event. (Def.'s Mot., Ex. M.) An opera by the composer Giuseppe Verdi was to be performed

inside the theater during the event, while a tree-lighting ceremony was to be held outside the theater. Plaintiff responded in an email stating:

> you f*ckers are so f*cked up over there...im already on [the sound] board for the f*cking veridi dude!!! get off your ass and walk over there and look....F*CK!!!!!!!

(Def.'s Mot., Ex. N.)

On December 5, 2007, Plaintiff was issued another Staff Discipline Report. This violation was for using the Theater for a private after-hours recording session. (Def.'s Mot., Ex. O.) Plaintiff admits he had been previously warned that personal use of the theater was prohibited without Zbosnik's prior written authorization. (Galeski Dep. at 75-76.) This was the third written reprimand that Plaintiff received. Plaintiff was warned that any further policy violation would result in his termination.

On February 14, 2008, Valentine's Day, Plaintiff recalls arriving to work after a "sleepless night, babies, ... just tired, irritated" and being greeted at the door by Zbosnik, who

> says, "I got a Valentine's Day gift for you."
>
> I said, "Not now. Not now."
>
> I walked by him and I start setting up a the mixing board for the show. ...
>
> He came in behind me and he said, "What's wrong with you?"
>
> I said, "The only Valentine's gift I want from you is my raise."
>
> He said, "Why should I give you a raise? You make the most out of everybody here and you do the least. You're not worth the money I pay you."
>
> I said, "Fire me then."
>
> He said, "Give me good reason."

14

> So he left. He came back and he said, "I've got a job for you. I got a new job for you."
>
> I said, "What is that?"
>
> He said, "Anywhere but here."
>
> I'm just frustrated now. I'm ignoring him.
>
> He said, "No, really, I got a job for you. ..."
>
> I said—then I lightened up, you know, he's just a yo-you back and forth with this stuff, you know, confusing me.
>
> I said, "That sounds interesting. I could use extra hours. ... Could you give me a contact number or maybe put in a good word for me?"
>
> He said, "Why do you think I would give you a good recommendation?"
>
> He walked out. He came back in ... 20 minutes later with an ice cream bar, ice cream sandwich.
>
> He said, "Here. Here's your Valentine's Day present."
>
> I took it. ...

(*Id.* at 79-80.) Other than Calvas, Plaintiff did not discuss this incident with anyone. (*Id.* at 82.)

On a date not entirely clear from the record, but not later than February 15, 2008, Plaintiff's privilege to free access of Defendant's Fitness Center was revoked. (Def.'s Mot., Ex. R.) Defendant has a policy of providing its employees with free access to its Fitness Center, but reserved the right to revoke this privilege at any time. (Def.'s Mot., Ex. Q.) The policy was in place since, at least, 2003—before Zbosnik's employment with Defendant began. The policy specifically cites employee misconduct as one of the reasons the privilege can be revoked, and this was the reason provided to Plaintiff. (Def.'s Mot, Ex. R.)

Shortly after Plaintiff learned that his Fitness Center privileges had been revoked, around February 28, 2008, Plaintiff filed an internal complaint. Plaintiff sent his complaint to Defendant's Department of Human Resources, claiming that he had been sexually harassed by Zbosnik, his immediate supervisor, for an extended period of time. (Def.'s Mot., Ex. P.) In the complaint, Plaintiff expresses his dissatisfaction with having his privilege to use the Fitness Center revoked earlier that month. On February 28, 2008, Human Resources Analyst Celina Lawlor replied to Plaintiff via email that she would investigate the situation. (Def.'s Mot., Ex. S.)

On March 3, 2008, Plaintiff was given another Staff Discipline Report—his fourth written reprimand—for failing to complete his work, leaving a drink near the sound equipment after being warned previously not to do so, and failing to conform to the employee dress code despite being previously warned. (Def.'s Mot., Ex. T.) Plaintiff refused to sign the Report, protested that he was being harassed, and informed Don Bean that he was "going to the EEOC." (Galeski Dep. at 87.)

The next day, March 4, 2008, Plaintiff hand delivered a second written complaint to Defendant. (*Id.* at 88.)

On March 6, 2008, Plaintiff met with Lawlor and Eric Peterson, Deputy Director of the Recreation Department to discuss his internal complaint. (Def.'s Mot., Ex. U.) This meeting was part of a larger investigation in which Human Resources Department associates interviewed six witnesses. The investigation culminated in a memo being issued on April 10, 2008.

At the March 6th meeting, Plaintiff claims that he informed Defendant that Zbosnik "'is trying to set me up. ... I don't want any personal contact with this man, whatsoever. ... I'm

16

in fear for my job and maybe being harmed.'" (Galeski Dep. at 91.) Plaintiff also alleged that Zbosnik harassed him by giving him candy bars and other snacks. Plaintiff acknowledged that he accepted the snacks and did not request Zbosnik to stop giving him snacks. When investigators met with Zbosnik, Zbosnik told them that he often gave employees snacks to improve morale, and that the practice was not limited to Plaintiff. Plaintiff alleged that Zbosnik told him that he had "nice eyes" and "nice hair" on separate occasions. When investigators met with Zbosnik, Zbosnik denied that he said such things. Plaintiff alleged that Zbosnik told him that he had worked in "porno shops," as a booking agent for transsexual performers, and that Zbosnik gave Plaintiff a tape of such a performance and offered to book a transsexual performance for Plaintiff. Plaintiff believed that these communications with him contained sexual innuendo. When investigators met with Zbosnik, Zbosnik denied giving Plaintiff a tape or offering to book a performance for Plaintiff. Zbosnik also denied speaking of owning a "porno shop." Zbosnik did acknowledge that outside of work he might have told employees about shows he used to book when he lived in Georgia, some of which may have included transsexuals. At the meeting, Plaintiff also claimed that Zbosnik put his hands down the pants of another male employee, Dave Posigian. When Posigian was interviewed, he acknowledged that on one occasion Zbosnik had helped him pull his pants up, that he told Zbosnik that he "didn't like" such behavior, and that Zbosnik never did it again. Posigian also said that on another occasion Zbosnik had touched a hole that was in Posigian's pant, but—on that occasion—Posigian thought that Zbosnik was merely pointing out that he had a hole in his pants and "that's all." Posigian told investigators that he thought that he got along well with Zbosnik and that Zbosnik was a "good guy." Plaintiff also claimed that employees Jon Smith and Aaron Gambino would

17

corroborate his version of events. When the human resources personnel met with Gambino, Gambino told them that he had never witnessed any instances of Zbosnik sexually harassing anyone, but he had seen Zbosnik around Plaintiff "a lot" and bringing Plaintiff Cokes. When the human resources personnel met with Smith, Smith told them that interactions between Plaintiff and Zbosnik were "regular and normal" and that Plaintiff "rebels against authority." Smith also said that, although Zbosnik is "different," Zbosnik did not give him bad vibes. (Def.'s Mot., Ex. U.)

Sometime after the March 6th meeting, Plaintiff recalls that Zbosnik had approached him whistling—"sort of like a doomsday whistle." (Galeski Dep. at 91-92.)

On another occasion, while Plaintiff was breaking down some equipment, Zbosnik attempted to assist Plaintiff in carrying a piece of stage equipment.

> We're breaking down the stage and [Zbosnik] is in suit and tie. He just furiously jumps on the stage, gets with me and he starts helping me carry this riser, which I can handle myself, but he's on the other end. I pick it up and he picks it up. ... He's whistling at me, and looking at me, and shaking his head and just eyeballing me down.

(*Id.* at 92.) Plaintiff reported this incident to Defendant. (*Id.* at 93.)

On March 29, 2008, despite being informed that he would subsequently be required to pay the daily entrance fee in order to use the Fitness Center, Plaintiff attempted to enter the Fitness Center without paying the fee. (Galeski Dep. at 104-105.) Alia Salem, who was working behind the counter at the Fitness Center, informed Plaintiff that he could not be admitted without paying the fee. Plaintiff, before walking into the Fitness Center, responded: "I'm going in anyways, talk to [Deputy Director of the Recreation Department] Mr. Peterson." Jamie Timiney, the Indoor Sports Supervisor for the Fitness Center, approached Plaintiff and explained that he could finish his workout that day but if he tried

18

to enter without paying again he would be reprimanded. Timiney and Salem then filed an Incident Report with Defendant describing what had occurred. (Def.'s Mot., Ex. V.)

In a report issued on April 10, 2008, the Human Resources Department concluded that Plaintiff "has been a problem for a long time ... [and] [t]here was little indication that [Plaintiff] will 'get with the program' and follow the direction [Zbosnik] is taking the theater." (Def.'s Mot., Ex. U.) The Human Resources department ultimately recommended that "it would be in the Recreation's best interest to terminate the employment relationship with [Plaintiff]." (*Id.*)

On April 13, 2008, Plaintiff sent Defendant a third written complaint. (Galeski Dep. at 96.)

On April 18, 2008, Defendant terminated Plaintiff's employment. (Def.'s Mot., Ex. X.)

On March 27, 2009, Plaintiff filed a Complaint in the United Stated District Court for the Eastern District of Michigan. (Def.'s Mot., Ex. Y [Docket Text # 1].)

This matter comes before the Court on Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an

19

element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

Plaintiff alleges that Defendant violated Title VII and Michigan's ELCRA "by subjecting Plaintiff ... to unwelcomed sexual harassment during his employment because of his sex ... and terminating Plaintiff ... because of his sex and/or in retaliation for his complaints against ... Zbosnik's unwelcomed sexual harassment and retaliation." (Compl. ¶ 26.) Defendant denies that Plaintiff was discriminated or retaliated against on the basis of sex, and that it should be granted summary judgment on Plaintiff's claims arguing that Plaintiff has failed to provide evidence to demonstrate either a prima facie case of sex discrimination or retaliation, or raise genuine issue of material fact regarding whether Defendant's decision to terminate him was pretextual.

20

This Court first discusses Plaintiff's sex discrimination claim, followed by his retaliation claim.

### A.  Sexual Harassment Claim

Plaintiff filed suit under both Title VII and Michigan's ELCRA. Claims of discrimination brought pursuant to the ELCRA are analyzed under the same evidentiary framework as similar claims brought under Title VII, and Michigan courts follow federal civil rights case law to interpret them. *Jackson v. Quantex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *see, e.g.*, *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 192-95 (Mich. 2003); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).[2] Both Title VII and ELCRA prohibit employers from discriminating against employees based on sex. *See* 42 U.S.C. 2000e-2(a)(1); Mich. Comp. Laws § 37.2102. Discrimination because of sex includes sexual harassment. *See, e.g.*, *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000). Sexual harassment includes both hostile environment harassment and quid pro quo harassment. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009); Mich. Comp. Laws § 37.2103(I).

It is unclear from the Complaint whether Plaintiff alleges that he was discriminated against in being: (1) subjected to unwelcomed sexual harassment by his supervisor, and

---

[2] This Court notes that although sexual harassment claims under Title VII and Michigan's ELCRA have some important differences, those differences are not relevant here. For example, "unlike Michigan's ELCRA, Title VII applies different standards for evaluating whether the employer as a whole is vicariously liable for the hostile work environment," depending upon whether the employee is harassed by a co-worker or a supervisor. *Clark v. United Parcel Svc., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005). This is not dispositive in this matter because Defendant argues that Plaintiff cannot establish an essential element of his hostile environment claim under Title VII or ELCRA in that Plaintiff cannot show that his supervisor's conduct was sufficiently severe or pervasive enough to alter the conditions of his employment so as to create an abusive working environment.

also disciplined and terminated in retaliation for his complaints of such harassment (hostile

work environment claim); or (2) disciplined and terminated in return for not acquiescing to

his supervisor's advances (quid pro quo claim). Nevertheless, this Court finds that Plaintiff

has failed to state a claim under either theory of sexual harassment.

### 1. Hostile Work Environment

Hostile work environment claims address workplaces "permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions

of the victim's employment and create an abusive working environment." *Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). In order to

establish a prima facie case of a hostile work environment based on sex, a plaintiff must

show that: (1) he is a member of a protected class; (2) he was subjected to unwelcome

sexual harassment; (3) the harassment was based on his sex; (4) the harassment created

a hostile work environment; and (5) the employer is vicariously liable. *Clark v. United Parcel*

*Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005). These requirements also apply to Plaintiff's

ELCRA claim.[3]

Defendant contends that Plaintiff has failed to create a genuine issue of material fact

with respect to the fourth element of his prima facie case because the alleged incidents are

not sufficiently severe or pervasive to create a hostile work environment. (Def.'s Mot. at 20-

---

[3] Under the ELCRA "[t]o establish his claim of hostile environment sexual harassment, Plaintiff must prove the following: (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior." *Chambers*, 614 N.W.2d at 915 (quoting *Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993)).

22.) "In determining whether the alleged harassment is sufficiently severe or pervasive ... the court must consider the totality of the circumstances." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) ("[A] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile work environment claim, even though no single episode crosses the Title VII threshold." *Id.* at 564). "Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark*, 400 F.3d at 351 (quoting *Harris*, 510 U.S. at 23). "[T]he test for a hostile work environment has both objective and subjective components." *Williams*, 187 F.3d at 566. In order to be actionable, an environment must be one "that a reasonable person would find hostile or abusive," and the employee must "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 21-22.[4] Thus, "[t]he plaintiff

---

[4] *Cf. Williamson v. BASF Corp.*, No. 05-74861, 2007 WL 172533, at *7 (E.D. Mich. Jan. 19, 2007) ("As to the fourth element, the Michigan Supreme Court has held that 'whether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment.' *Radtke*, 501 N.W.2d at 167. Quoting, with approval, a decision by the United States Supreme Court, the Michigan Supreme Court further observed that:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Quinto v. Cross and Peters Co.*, 547 N.W.2d 314, 323 (Mich.1996) (quoting *Harris v.*

must show that the working environment was both objectively and subjectively hostile." *Clark*, 400 F.3d at 351.

It is well-established that "[t]he prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). *See also Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) ("Title VII, we have said, does not set forth a general civility code for the American workplace."). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (internal quotations and citations omitted). Such a limitation is required "to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory conditions of employment." *Oncale*, 523 U.S. at 81. Thus, courts should "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (internal quotation marks omitted).

Accepting Plaintiff's version of the facts as true, this Court concludes that Plaintiff cannot establish the fourth element of his prima facie case—that he was subjected to a hostile work environment. Applying the required reasonableness test and considering the totality of circumstances, this Court examines the conduct that Plaintiff argues gives rise

---

*Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993)).").

to his hostile environment sexual harassment claim: the ten instances described in the Complaint, (Compl. ¶¶ 14-18), and the thirteen other events described in Plaintiff's deposition—occurring between November 15, 2006, when Zbosnik's "odd behavior" began, and April 18, 2008, Plaintiff's date of termination—each described in detail above.

Considering the frequency, severity, presence or absence of physical threats or humiliating behavior, whether merely offensive utterances were involved, and whether the objectionable conduct interfered with Plaintiff's work, this Court concludes that the alleged sexual harassment of Plaintiff by his supervisor, Zbosnik, was not severe or pervasive and thus failed to create a hostile working environment. *See Quinto*, 547 N.W.2d at 323. First, with the exception of Zbosnik periodically bringing Plaintiff food items and driving down Plaintiff's street, "his actions lack the continuous nature of conduct the Sixth Circuit has deemed sufficient to constitute a hostile work environment." *Mahan v. Peake*, No. 07-15223, 2009 WL 174130, at *6 (E.D. Mich. Jan. 23, 2009). Second, Plaintiff's allegations lack the necessary severity. *Id*. When Plaintiff's allegations are compared to other cases where the plaintiff showed the existence of a hostile workplace, it becomes clear that he has not made a prima facie showing of hostile work environment. *See id*. Finally, Plaintiff has presented no evidence that any of the alleged objectionable conduct interfered with his work performance. Plaintiff has failed to present sufficient evidence such that a reasonable juror could find an actionable hostile work environment. Accordingly, Plaintiff cannot establish the fourth element of his prima facie case for sexual harassment under the theory of hostile work environment.

### 2. Quid Pro Quo

Alternatively, an employee can establish a violation by proving that he has experienced quid pro quo sexual harassment. The Supreme Court has observed the differences between quid pro quo and hostile environment sexual harassment claims:

> Cases based on threats [to retaliate against an employee if he denied a sexual advance] which are carried out are referred to as quid pro quo cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. The terms quid pro quo and hostile work environment are helpful, perhaps in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this they are of limited utility. ...
>
> We do not suggest the terms quid pro quo and hostile work environment are irrelevant to Title VII litigation.... When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.

*Burlington Indus.*, 524 U.S. at 751, 753-54. Michigan law draws a similar distinction. *See*

*Chambers*, 614 N.W.2d at 916.

> To prevail on a quid pro quo claim of sexual harassment, a plaintiff must assert and prove (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability.

*Highlander v. K.F.C. Nat'l Mgt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986).

Plaintiff claims that his privilege of free use of the Fitness Center was revoked in retaliation for refusing Zbosnik's sexual advances. None of the events, comments nor conduct, which allegedly occurred between Plaintiff and Zbosnik were sexual advances or

26

requests for sexual favors nor do they demonstrate that Plaintiff would lose a privilege or be terminated in response to his refusal of Zbosnik's sexual demands. Plaintiff, describing one of the alleged events, stated in his deposition that "[i]t wasn't directly sexual harassment, but it was very odd and inappropriate behavior." (Galeski Dep. at 27-28.)

Defendant policy was clear: free use of the Fitness Center was a privilege that could be revoked at any time, and the privilege would be revoked upon employee misconduct. This policy applied to all employees and was in place before Zbosnik's tenure as Theater manager. Plaintiff had accumulated multiple reprimands by the time his Fitness Center privileges were revoked, and Plaintiff has not presented sufficient evidence from which a reasonable juror could conclude that the revocation was a result of his refusal to submit to any supposed sexual demands from his supervisor.

Accordingly, Plaintiff has failed to establish the requisite elements that give rise to a quid pro quo theory of discrimination.

## B. Retaliation Claim

Plaintiff also claims that Defendant violated Title VII and Michigan's ELCRA by retaliating against him for reporting Zbosnik's sexual harassment. To establish his claim of retaliation, Plaintiff may use either direct evidence that Defendant intentionally discriminated against him or by presenting circumstantial evidence, following the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting analysis. *See Graham v. Ford*, 604 N.W.2d 713, 717 (Mich. Ct. App. 1999). Under either approach, Plaintiff must establish "a causal link between the discriminatory animus and the adverse employment decision." *Sniecinski v. Blue Cross and Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich. 2003). In this case, Plaintiff has presented no direct evidence of discrimination.

27

Because Plaintiff is attempting to establish his discrimination claims with circumstantial evidence, the burden-shifting analysis set forth in *McDonnell Douglas* is applied.

The *McDonnell Douglas* burden-shifting framework consists of three stages. The plaintiff must first demonstrate a prima facie case of discrimination. *See Clack v. Rock-Tenn Co.*, 304 Fed. App'x 399, 402 (6th Cir. 2008). If the plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). After the employer articulates a legitimate, non-discriminatory reason, the plaintiff must come forward with evidence showing that the employer's proffered explanation is simply a pretext for unlawful discrimination. *See id.* Moreover, the business judgment of the employer may not be questioned because the issue is not whether the decision was wrong or mistaken, but whether the decision was discriminatory. *See Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996).

Defendant argues that Plaintiff's retaliation claim fails for two reasons. First, Defendant contends that Plaintiff has failed to make a prima facie case of retaliatory discharge by failing to show causation between his discrimination complaint and his firing. Alternatively, Defendant argues that Plaintiff cannot show that Defendant's proffered non-retaliatory reasons for his discharge were a pretext for retaliation. As to both, this Court agrees, and discusses each in turn.

### 1. Prima Facie Case

To establish a prima facie case of retaliation, Plaintiff must show that (1) he was engaged in a protected activity; (2) Defendant knew that Plaintiff did so; (3) Defendant thereafter took an adverse employment action against him; and (4) there was a causal

28

connection between the protected activity and the adverse employment action. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

Defendant argues that Plaintiff has not and cannot establish the fourth element of his retaliation claim: that there was a causal connection between the protected activity and the adverse employment action. "In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999).

Plaintiff has offered no evidence to show a causal connection between his protected activity and his termination besides the temporal proximity of his internal complaint and his termination.

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). On February 28, 2008, Plaintiff first notified Defendant of the alleged sexual harassment by filing an internal complaint. Plaintiff's employment was terminated on April 18, 2008—approximately nine weeks later and subsequent to an investigation into Plaintiff's internal complaint by Defendant's human resources department. Because sufficient time elapsed between the

29

time when Defendant learned of a protected activity and Plaintiff's termination,[5] temporal proximity alone is insufficient to establish causation. *See, e.g.*, *Woods v. Washtenaw Hills Manor Inc.*, No. 07-15420, 2009 WL 728537, at *15 (E.D. Mich. Mar. 19, 2009).

Plaintiff has provided no other corroborating evidence to demonstrate causation. The only evidence of causation produced by Plaintiff—the temporal proximity of his internal complaint and his termination—fails to establish causation. Thus, Plaintiff has not presented sufficient evidence from which a reasonable juror could conclude that a causal connection exists between the protected activity and the adverse employment action. Accordingly, Plaintiff has failed to establish his prima facie case of retaliation against Defendant.

### 2.   Defendant Articulated a Legitimate, Non-Discriminatory Reason

Even if Plaintiff had established a prima facie case of retaliation, Defendant argues that it would nonetheless be entitled to summary judgment. This is so, Defendant argues, because it has presented evidence supporting a legitimate, non-discriminatory reason given for Plaintiff's termination and because Plaintiff has not presented evidence showing that such reasons for the challenged employment action was a pretext for discrimination.

This Court finds that Defendant has presented evidence supporting the legitimate, non-discriminatory reasons given for the employment action Plaintiff challenges. Specifically, Defendant has presented evidence of: (1) Plaintiff's repeated violations of

---

[5] This Court notes that Defendant's revocation of Plaintiff's Fitness Center privileges occurred prior to Plaintiff filing his internal complaint, and thus cannot serve as the adverse employment action.

Defendant's policies for which he was provided written discipline; and (2) Plaintiff's history of insubordination.

### 3.   Plaintiff has Not Established that Reason Proffered is Pretext

Because Defendant satisfied its burden—showing that it had a legitimate, non-discriminatory reason for Plaintiff's termination—the burden of production now returns to Plaintiff. *Univ. of Cincinnati*, 215 F.3d at 573. To meet his burden, Plaintiff is required "to show the existence of evidence sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 526 (Mich. 2001) (internal quotation and citation omitted).

Plaintiff may establish pretext and "refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (internal quotation and citation omitted). Plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008) (internal quotation and citation omitted). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated

31

against him." *Kroger Co.*, 319 F.3d at 866 (internal quotation and citation omitted). Plaintiff has failed to meet that burden here.

There is no genuine issue of material fact regarding pretext. Plaintiff has not presented evidence showing Defendant's reasons for terminating him has no basis in fact. Likewise, Plaintiff presents no evidence showing that Defendant's conclusion, that he violated policy and displayed insubordination, did not actually motivate Defendant's decision to terminate Plaintiff or was an insufficient reason to terminate him. Even if Plaintiff had established a prima facie case of retaliation, he has not come forward with evidence that would allow a reasonable juror to find that the legitimate non-discriminatory reasons Defendant asserted for its challenged actions were a pretext for discrimination. Accordingly, his claim of retaliation fails as a matter of law.

## IV.   Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: January 27, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 27, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

32